53 N.J. Super. 316 (1959)
147 A.2d 280
THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
ANTHONY DeROCCO, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued December 22, 1958.
Decided January 5, 1959.
*317 Before Judges GOLDMANN, CONFORD and HANEMAN.
Mr. Ralph S. Heuser argued the cause for appellant (Messrs. Heuser, Heuser & DeMaio, attorneys).
Mr. William D. Danberry, Assistant Prosecutor, argued the cause for respondent (Mr. Warren W. Wilentz, Middlesex County Prosecutor, attorney).
The opinion of the court was delivered by GOLDMANN, S.J.A.D.
Defendant was found guilty by a jury under an indictment charging him with obtaining money under false pretenses (N.J.S. 2A:111-1) from the First National Bank of South Amboy by knowingly and falsely representing that he was the owner of a 1956 Chevrolet convertible, thereby obtaining a loan of $1,265 on the security *318 of the automobile. He appeals from the judgment of conviction.
Defendant had been in the used car business from 1948 to 1953, and at the time of the loan was building some houses in Matawan, N.J. The bank's loan officer testified that defendant had been to see him about financing his building project and was referred to the Federal Housing Administration office in Newark. He returned a few days later, on October 25, 1956, and after discussing his mortgage financing problem, told the bank officer that he had recently purchased a 1956 Chevrolet for cash and thereby stripped himself of working funds. He inquired about a possible loan to meet unpaid bills. A $1,265 monthly installment loan was agreed upon, to be secured by the automobile. Defendant did not have a New Jersey certificate of ownership with him, but returned several hours later and produced one. The loan was then completed, defendant executing a note and a chattel mortgage covering the Chevrolet. In accordance with the Motor Vehicle Act, he also executed a statement of encumbrance showing the bank as mortgagee. The bank officer testified that no payment had ever been made on the note, and the bank's attempts to locate defendant had been unsuccessful.
The State's main witness was Russell Ewer, defendant's friend and neighbor for some four years. Ewer testified that he was in financial difficulties in July 1956 and discussed the matter with defendant, who outlined a scheme for getting money by obtaining a false automobile registration in New Jersey and borrowing money against the car. This required getting the serial number, make, model and other information about an automobile, and then going to South Carolina where a motor vehicle registration could be obtained merely by executing a sworn application setting out the name and address of the alleged owner, the date the car was acquired and a description of the car. Ewer testified that he obtained the necessary data from the registration certificate of a person he knew at Fort Dix, N.J., who owned a new 1956 Chevrolet convertible. He and defendant *319 went to South Carolina where, on July 25, 1956, Ewer executed the necessary application form and obtained a motor vehicle registration. The two immediately returned to New Jersey. Thereafter Ewer, accompanied by defendant, applied for and obtained a New Jersey certificate of ownership on the basis of the South Carolina registration.
Ewer testified that he twice tried to borrow money on the strength of the certificate of ownership. He was unsuccessful and informed defendant he was abandoning the scheme. The next time he saw defendant was October 25, 1956. On that occasion defendant asked Ewer if he still had the certificate and, finding that he did, asked that he sign it over to him since he might have some use for it. Ewer then executed the assignment on the reverse side of the certificate, thereby transferring ownership to defendant.
Ewer did not see defendant again until January or early February 1958, when the latter came to his home and discussed the impending criminal trial. Defendant complained about Ewer having told a state trooper that he never owned the car. He inquired of Ewer whether the trooper had led him on and made him say things he did not want to say; pointed out that the trooper had no warrant; and finally said: "I'm not going to be found guilty," and "If necessary, I'll say that I got the money and gave it to you."
The State then rested. Defendant moved for judgment of acquittal. The motion was denied.
Defendant's story was that about October 23, 1956 Ewer told him he was in financial trouble; that he had recently purchased a 1956 Chevrolet convertible but had been unsuccessful in obtaining a loan on it; and that Ewer suggested he would endorse the certificate of ownership over to him so that defendant could then borrow money for Ewer with the car as security. A day or two later defendant told Ewer he could get a loan for him, whereupon Ewer assigned the certificate of ownership to him and he went to the First National Bank of South Amboy and arranged for the loan. He denied having gone to South Carolina with Ewer, but *320 admitted that earlier in 1956 he had twice been in Columbia, S.C., the place where the motor vehicle registration was issued. He denied that he had intended to cheat the bank.
The following ensued on defendant's cross-examination:
"Q. Mr. DeRocco, do you know State Police Officer Clinton Pagano? A. I know him to see.
Q. Did you ever see him before today or yesterday? A. Certainly.
Q. When did you first see him, Mr. DeRocco? A. In Union County Jail. I would say it was February of 1957, perhaps, March. Don't hold me to the month. Time goes very slowly in jail.
Q. He talked with you about the charge and the indictment that we are trying at the present time, is that right? A. That's correct.
Q. And did you give him a statement? A. I did not.
Q. Did you tell him what you told this jury today? A. He wouldn't listen to it.
Q. He wouldn't listen to it? A. That's correct.
Q. How long did he stay with you? A. About an hour.
Q. And for an hour he wouldn't listen? A. That's correct. He kept telling me what he wanted me to write down.
Q. Did you sign anything? A. I did not. Except my fingerprint card. I beg your pardon.
Q. Did you see the statement of Russell Ewer at that time? A. I did not.
Q. Did he mention Russell Ewer to you? A. Yes. He did.
Q. Did you tell him that you knew Russell Ewer? A. Yes. I did.
Q. Did you tell him what had transpired between you and Russell Ewer and the First National Bank of South Amboy? A. I did not.
Q. What did you tell him? A. I told him very little. Except, that first of all, I told him I wanted my attorney present before I would make a statement.
Q. There was a jailer present, wasn't there? A. No. We were in a room, just the two of us.
Q. When he first came in, isn't it a fact that there was a jailer present in the same room with you? A. Not to my knowledge.
Q. And isn't it a fact that you told the jailer to get out of the cell? A. I doubt it very much. You don't tell a jailer to get out of the cell if he is there.
Q. Isn't it a fact that you asked Officer Pagano to have the jailer leave the cell? A. I doubt it very much.
Q. You doubt it very much? A. Yes, sir.
Q. Does that mean that it could be so? A. No.
Q. Or that you don't remember. A. I did not.
Q. You definitely did not tell him that? A. Definitely did not, to the best of my knowledge.
Q. Isn't it a fact, Mr. DeRocco, that you told State Police Officer Clinton Pagano, that you went to South Carolina with  A. I did not.
*321 Q. That you knew you had a false and fictitious Bill of Sale? A. I did not.
Q. That you went to the South Amboy bank and you obtained this money and that you used it? A. No.
Q. You didn't? A. No. I did not.
Q. Isn't it a fact that you told Officer Pagano that this fellow Ewer was just a sap, that he didn't know what was going on? A. I did not.
Q. What? A. I did not. No, sir.
Q. Isn't it a fact that after you told him that, you said that you will never tell that before any witness? A. I did not.
Q. Isn't it a fact further that you even examined his brief case that day to see if, as you said, there was a bug in it or a dictaphone? A. That is ridiculous. I never did any such thing.
Q. You didn't? A. No. I did not.
Q. None of that is true, Mr. DeRocco? A. No, sir."
The only other defense witness was Mrs. DeRocco.
There was rebuttal testimony calculated to show defendant's precarious financial situation at the time of the loan transaction, and to establish that the 1956 Chevrolet convertible actually belonged to a Ruth Muzzy. The State also produced on rebuttal Trooper Pagano, a specialist in automobile theft investigation and identification. Over defendant's objections, he was permitted to testify to a conversation he had had with defendant in the Union County Jail at a time when defendant was awaiting trial on a conspiracy charge. In the course of that conversation defendant told Pagano essentially the story given by Ewer earlier in the trial.
The single question defendant raises on this appeal is that it was prejudicial error for the trial court to permit the prosecution to introduce by way of rebuttal the testimony of Trooper Pagano as to defendant's admissions of guilt, when that evidence could and should have been produced on the State's case in chief. The argument is that the Pagano testimony did not go to contradict any new matter introduced on the direct examination of defendant; that defendant's denial of having made any statement to Pagano admitting guilt was precipitated solely by the cross-examination; and that the prosecution thereby managed to open and close the case with evidence damaging to the accused, *322 so that he lost the psychological advantage of contradicting the State and was instead placed in the position of being contradicted. We note that defendant made no effort to reply to the rebuttal evidence. The argument that he was deprived of the opportunity to call the jailer, a witness to defendant's confidential talk with the trooper, is specious. In the first place, defendant on cross-examination said that only he and Pagano were present at the time of the conversation. Secondly, the defense at no time requested an opportunity for sur-rebuttal, although the county jail employee was undoubtedly readily available.
The crime with which defendant was charged, and the issue tried to a jury, was whether defendant procured money by false pretenses from the South Amboy bank. On his direct examination defendant specifically denied guilt of the charge and sought to give the lie to Ewer, the State's main witness. When closely questioned on cross-examination as to whether he had told Trooper Pagano that he had gone to South Carolina, that he knew he had a fictitious certificate of ownership, and that he used it to obtain money from the bank, his answer uniformly was a flat denial. The rebuttal evidence therefore concerned a matter intimately connected with and relevant to the offense charged. It was not a collateral matter, unconnected with the issue being tried. Had it possessed that quality, it would have been improper, since in such a case the State would have had to abide by the answers given, and other witnesses could not be called to contradict them. State v. Hatch, 21 N.J. Super. 394, 399 (App. Div. 1952); State v. Mor, 85 N.J.L. 558, 562-563 (Sup. Ct. 1914); cf. State v. Simon, 113 N.J.L. 521, 533-534 (Sup. Ct. 1934), affirmed 115 N.J.L. 207 (E. & A. 1935).
The obvious purpose of the State in cross-examining defendant as to his conversation with Trooper Pagano was to lay a basis, in case he should deny the admissions of guilt he made in the course thereof, so that his credibility might be impeached by the rebuttal testimony of the trooper himself. This procedure seems to have been approved by the *323 former Court of Errors and Appeals in State v. Morehous, 97 N.J.L. 285, 295 (1922), where defendant charged error by the trial court in permitting the State to question him on cross-examination concerning admissions he had made to third parties. The court found no error, since the questions "were asked for the purpose of laying a foundation for the contradiction of the witnesses. The defendant had denied on direct examination that he had committed the crime. He also denied that he had been at the factory where [the victim] was employed on the night of January 1st. It was therefore proper for the state to lay the foundation on the cross-examination of the defendant for his contradiction on these matters. * * *," citing State v. Dichter, 95 N.J.L. 203 (E. & A. 1920).
Our courts have held that the question of what is proper rebuttal evidence, and whether it should be admitted, lies within the trial court's discretion, and the exercise of that discretion will not be disturbed in the absence of gross abuse. See, for example, State v. Skillman, 76 N.J.L. 464, 467 (Sup. Ct. 1908), affirmed 77 N.J.L. 804 (E. & A. 1909); State v. Unger, 93 N.J.L. 50, 53 (Sup. Ct. 1919); State v. Dichter, above, 95 N.J.L., at page 206; State v. Napolitano, 95 N.J.L. 546, 548-549 (E. & A. 1921); State v. Friedman, 98 N.J.L. 577 (E. & A. 1923); State v. Dolbow, 117 N.J.L. 560, 563 (E. & A. 1937); cf. Allison v. Bannon, 128 N.J.L. 161, 162-163 (E. & A. 1942). And see R.R. 1:5-1 which provides that in criminal causes error in the admission or rejection of testimony or in any other ruling or order made during the course of the trial shall be cause for reversal only if specific objection thereto was made and "it appears from the entire record of the proceedings had upon the trial that the defendant thereby suffered manifest wrong or injury."
The great weight of authority is in accord with the holding of our cases. See 53 Am. Jur., Trial, § 129, p. 113 (1945), stating that
"* * * the admission in a criminal prosecution of evidence as a part of the rebuttal, when such evidence would have been properly *324 admissible in chief, rests in the sound discretion of the trial judge and will not be interfered with in the absence of gross abuse of that discretion."
See also the cases collected in the 1957 Pocket Supplement to 6 Wigmore on Evidence, § 1873, pp. 152-155; 23 C.J.S., Criminal Law § 1050, p. 450 and p. 454 (1940).
Defendant claims that the State intentionally withheld the trooper's testimony when it knew that he could have been put on the stand and his testimony offered as part of its case in chief. It is by no means apparent that the prosecutor deliberately held the trooper's testimony in reserve in order to subject defendant to an unfair disadvantage. We have already remarked that defendant had the right, had he requested it at the trial, to be permitted to refute the details of the Pagano testimony. The only "prejudice" defendant may claim is that had the trooper testified first, defendant might have molded his testimony to avoid being caught as flatfootedly as he was by the rebuttal testimony. Putting it another way, had defendant been assured that the trooper would not be allowed to appear as a rebuttal witness, he might have lied with a greater sense of impunity on his cross-examination. Neither possibility appeals to this court as an appropriate basis for a claim of prejudice.
Defendant also argues that the trooper, in the course of narrating what defendant told him, stated that defendant had said he did not want the jailer present, asked if the room was "bugged," and inquired what the trooper had in his bag. The defense argues that these were collateral matters brought out by the prosecution on cross-examination and which it should not have been permitted to contradict on rebuttal. The references to the jailer and the "bugging" were merely incidental to the crux of Trooper Pagano's testimony that defendant had admitted the crime. At best, they were little more than background for his account of the admissions defendant made to him. It would be unrealistic to attempt to separate these harmless statements and hold them collateral.
*325 Under all the circumstances, there was no abuse of discretion by the trial judge in permitting rebuttal testimony by the trooper, and the judgment of conviction should therefore be affirmed.
However, before leaving the subject we would allude briefly to what we consider the more preferable course to be followed in a criminal prosecution, and that is for the State to present everything relevant as part of its case in chief. We consider this the more orderly practice and one which will avoid the criticism of unfairness as well as an attack on appeal which requires us to assess whether the trial court, in exercising its discretion and admitting rebuttal testimony, did not visit manifest wrong and injury upon a defendant. As Wigmore points out, a rebuttal should be necessary "only because, on a plea in denial, new subordinate evidential facts have been offered, or because, on an affirmative plea, its substantive facts have been put forward, or because, on any issue whatever, facts discrediting the proponent's witnesses have been offered." It is better that rebuttal be limited to evidence which has been made necessary by the defendant's case. 6 Wigmore on Evidence, § 1873, p. 510 (1940).
Affirmed.