750 A.2d 91 (2000)
330 N.J. Super. 395
STATE of New Jersey, Plaintiff-Respondent,
v.
Robert COOK, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Submitted February 7, 2000.
Decided February 25, 2000.
*94 Ivelisse Torres, Public Defender, for defendant-appellant (Mark E. Tabakman, Designated Counsel, on the brief).
John J. Farmer, Jr., Attorney General, for plaintiff-respondent (Robert E. Bonpietro, Deputy Attorney General, of counsel and on the brief).
Before Judges KEEFE, A.A. RODRIGUEZ and COLLESTER. *92
*93 The opinion of the court was delivered by COLLESTER, J.A.D.
Defendant, Robert L. Cook, appeals his conviction and sentence under Indictment No. 87-97-0563-I for first degree murder, contrary to the provisions of N.J.S.A. 2C:11-3a(1) and -a(2) (counts one and two); first degree felony murder, contrary to the provisions of N.J.S.A. 2C:11-3a(3) (count three); two counts of first degree robbery, contrary to the provisions of N.J.S.A. 2C:15-1 (counts five and six); and second degree possession of a weapon for an unlawful purpose, contrary to the provisions of N.J.S.A. 2C:39-4a (count seven). Defendant was tried in a capital proceeding. Although the jury found that defendant had committed murder by his own conduct, only eleven jurors found that he purposefully or knowingly caused death. As a result, the case did not proceed to a penalty phase.
Defendant was sentenced on the murder conviction to a custodial term of life imprisonment with a thirty year parole ineligibility period on count one to run consecutive to sentences imposed "anywhere." (At the time of sentencing, defendant had been convicted of three separate murders in Pennsylvania for which he received a death sentence and two life sentences.) On count five, first degree robbery, the sentencing judge imposed an extended term sentence of life imprisonment with a *95 twenty-five year parole ineligibility period, to run consecutively to the sentence imposed on count one and to any other sentence imposed "anywhere." On count six, first degree robbery, the court imposed an extended term sentence of life imprisonment with a twenty-five year parole ineligibility period, to run concurrently to the sentences imposed on count five and consecutive to any other sentences imposed "anywhere." The court merged count three into count one and count seven into count five. Therefore, the aggregate sentence was life imprisonment with a thirty year parole ineligibility period to be followed by an additional life sentence with a twenty-five year parole ineligibility period.
Defendant's convictions stem from the shooting of a gas station attendant during the course of an armed robbery at an Arco gas station at about 2:00 p.m. on Palm Sunday, March 31, 1985. The State's proofs were substantially as follows.
Defendant's cousin, Randy Wright, had begun working on February 15, 1985, at the Arco station which was located on Route 73, just off of the Tacony-Palmyra Bridge from Philadelphia in Palmyra, New Jersey. The Arco station was one of the company's busiest locations in New Jersey, pumping almost three times the gasoline of an average station. Because it was open twenty-four hours a day, staffing for the station required three shift changes, one at 7:00 a.m., one in the early afternoon at 2:00 p.m. or 3:00 p.m., and one late at night. During the week, money from the station would be deposited in the bank twice, once after the morning shift break and once after the early afternoon change; on weekends, however, a single bank drop would occur following the early afternoon break. Before that deposit was made the station would have the maximum amount of cash on premises.
Kim Woodson, defendant's girlfriend, heard defendant and Randy talk about how there would be $12,000 at the Arco station on a weekend before a station manager would make the bank drop. She said that defendant came to her house on March 31, 1985, and that he left with a rope, a pair of her sunglasses and a cap. Defendant picked up Randy Wright at 1:30 p.m., and they parked defendant's blue truck behind a Lincoln-Mercury auto dealership across the street from the Arco. Wright remained in the car while defendant crossed the street to the Arco station at about 2:45 p.m.
Hugh Brown, a sixteen year old high school student, was pumping gas at the Arco station when he saw a man come across the street. He described him as a thin black male, approximately six feet tall, wearing a black cap, women's sunglasses and army fatigues. When the man asked Brown if "Mark" and "Craig," the station managers, were around, Brown said they were in the office.
John Cloran, an eighteen year old employee, was behind the cash register in the snack shop counting receipts when a black man came in and asked for a job application. Paying little attention, Cloran pointed to the back office.
Craig Brodsky, assistant manager of the day shift, and Mark Irons, assistant manager of the afternoon shift, both twenty years old, were in the office with Joseph Fioretti, another gas station attendant. Brodsky had counted the money from the day shift and had placed it in a night deposit bag on the top of his desk in anticipation of making a "bank run" on his way home. A black man entered the office and asked to see Craig or Mark to get a job application. Brodsky gave him the application and directed him to complete it in the garage area.
The man left the office but returned a couple of minutes later and stuck a gun in Fioretti's neck, announcing a robbery. When Brodsky hesitated, the man shoved the gun at his nose and directed all three men to the floor. He kicked Brodsky in the head repeatedly, breaking some teeth and injuring his chin. He directed Irons to tie up Brodsky and Fioretti and place *96 the bank bag with $15,000 to $20,000 into a gym bag the man was carrying. He ordered Irons to open the safe and Irons gave up a bag containing $970. The man tied up Irons and told all of them to tell the police that the crime had been committed by a Puerto Rican. He warned them not to be "a dead hero" and threatened that he had friends in Philadelphia who would shoot them if they said anything else.
The man then asked the names of the attendants working on the station island and which one was closest to the snack shop. Told that it was Cloran, the man left the office and told Cloran that the manager wanted to see him. When Cloran approached the door to the office, the man stuck a gun in his back, took money from his pockets and hit him in the face. He then tied up Cloran and placed him on the ground with the three other men.
After being told the employee on the far right island was Hugh Brown, the man went into the snack shop and found Brown on a cigarette break. He told him that Craig or Mark wanted to speak with him. As Brown walked into the office, the man stuck a gun in his back and asked Brown for his money. After Brown gave him one and five dollar bills from his front pocket, he was told to "quit playing games" and to give him the money in his back pocket. Brown complied and was directed to lie on the floor.
Clifford Snyder, the remaining attendant, walked into the garage asking where everyone was. Hugh Brown saw the man go into the garage and Snyder hand him money. He then saw the man shoot Snyder in the face, killing him. After Snyder slumped down the wall to the floor, the man went through his pockets. He then reentered the office and told the victims on the floor, "[O]h, remember I was a Puerto Rican. Don't be a dead hero." His last words were, "Have a nice day." He then left, cut phone cords and crossed the highway toward the Lincoln-Mercury dealership.
After the assailant left, the employees stayed on the floor until they heard a customer looking for an attendant. They left the office and passed the dead body of Clifford Snyder in the hallway just outside.
Patrolman Larry Lippincutt of the Palmyra Police Department received a radio call of a robbery at the Arco station and arrived at 3:20 p.m. Meanwhile, an employee of the Lincoln-Mercury dealership called to report that some clothing had been found behind the building. Lippincutt responded and found a green army jacket, black hat, black studded belt, a pair of gloves and women's sunglasses scattered in the street near the curb. Later, Kim Woodson identified the hat and glasses as similar to the ones that defendant took from her earlier that day and never returned. She said that the studded belt and gloves were like those regularly worn by the defendant. When shown four pieces of jute rope of various lengths that had been used to bind some of the robbery victims, she identified the rope as the same type she gave the defendant earlier on the day of the robbery and murder.
On the evening of March 31, 1985, the defendant called Kim Woodson to ask if she had watched the 6:00 p.m. news on television. When she said no, he told her to watch the 11:00 p.m. news without giving her a reason. At about 11:00 p.m. that night defendant and Wright went to the home of Darcyne Brown, Wright's girlfriend, and stayed for about forty-five minutes. Wright told Brown that if anyone should ask her anything she should reply, "I don't know."
The following day Wright quit his job at the Palmyra Arco station. On the same day the defendant brought his gym bag to Kim Woodson's home and asked her to store it for him. He later returned to retrieve the bag and was upset that Kim was not there. Later he expressed his displeasure with her by throwing money on the bed. He also admitted to Kim that he had tied somebody up with the jute rope she had *97 given him and had to shoot someone in the head.
After the murder and robbery, Brown and Wright purchased a number of expensive items including a motorcycle, drugs, clothes, jewelry and beepers. On April 17, 1985, the two men celebrated Wright's birthday with their girlfriends at the Seafood Shanty in Philadelphia. Darcyne testified that she was concerned as to who would pay for the meal since she was the only one who was working. During dinner the defendant asked the women if they had seen on the news the composite drawing of the person who had committed the murder and robbery at the Arco station. When Darcyne said that she had, the defendant smirked and asked who she thought the composite resembled. Darcyne surmised that the defendant was referring to himself. Defendant picked up the check for the four celebrants.
Defendant made several other admissions concerning his participation in the crimes at the Arco station. At Kim's residence with Wright and Darcyne present, defendant said that he and Wright had gone to the Arco at a particular time in the afternoon because that was when the most cash would be on hand. He said that while Wright waited inside the truck, he went inside and asked to speak to the manager. He said that he tied up the manager and the people he called one by one into the back. He admitted that he shot the last attendant in the head because the attendant hesitated in doing what was ordered. He also thought that the attendant recognized him. After the crime, he returned to where he had left the truck and was surprised to find Wright since he had told him to leave if he heard a gun shot. He said that the take from the robbery was about $16,000. In another conversation with Kim, the defendant again told her that he tied up the victims and demonstrated with his finger how he had shot the attendant.
Defendant also admitted his guilt to Paulette Duncan, a friend to whom he had sold drugs. Duncan said that the defendant told her in a phone conversation that he had robbed a gas station in New Jersey and shot someone for being a "smart ass." In another phone conversation, he told Duncan that he and Wright had gone to a gas station, robbed it and then went to a bar for a few drinks. He said that he had the station employees on the floor and had shot the other attendant because he thought he could identify him. In another conversation he showed how he had shot the attendant by making a pointing motion with his finger.
Another incriminating conversation took place in March 1997. Cartel Wright, defendant's cousin, testified that defendant admitted to him that he committed the robbery, that he shot the victim in the head at point blank range and would not hesitate to do so again if someone got in his way. Defendant told Cartel Wright that he had gotten $18,000 or $19,000 from the robbery and had given $5,000 to Randy Wright.
As the police investigation continued, photographic arrays were shown to the victims. John Cloran was unable to make an identification from the array shown to him, explaining that he was so fearful that he never got a good enough look at the assailant to identify him. On August 20, 1985, Mark Irons was shown a photo array and gave a tentative identification of Jacinto Hightower. Later that day he was taken to Hightower's arraignment for an unrelated murder. He became visibly agitated and nervous when Hightower entered the courtroom and he told the accompanying officer that he was ninety-five percent sure that Hightower was the killer.
Craig Brodsky was shown the same array as Irons in 1985, and he said that the picture of Hightower was the closest to that of the perpetrator, although he was not sure enough to make a positive identification. In 1988 he was shown another photographic array, and within a minute he selected defendant's photograph as being *98 Snyder's killer. He also made an in-court identification of defendant as the murderer.
Joseph Fioretti testified that in 1985, he saw a newspaper photograph of Hightower and called the police to say that the photo looked like the assailant. Shown the same photo array as Irons and Brodsky, Fioretti selected Hightower's photograph and said he was "ninety percent sure." On July 12, 1988, Fioretti was shown the same array as displayed to Irons and Brodsky in 1988, and he then selected the photograph of the defendant, indicating he was 100 percent sure. He also identified defendant in court.
The defense was misidentification. Defendant's sister, Loretta Wilkins, testified that her brother had a shag haircut in 1985. Margaret Langan, a retired nun, testified for the defense that on March 31, 1985, she was driving on Route 73 when she saw a man wearing sunglasses and an army jacket running from the Arco station in front of her vehicle carrying a canvas bag over his right shoulder. After seeing a composite drawing on the news, Langan called police to tell them she saw that person running from the Arco station. On August 30, 1985, she positively identified a photograph of Hightower, and said she was 100 percent certain. Moreover, during Hightower's trial for an unrelated murder, she wrote a letter to the trial judge saying that she knew that he was the same person she had seen in Palmyra on March 31, 1985.
The State's rebuttal testimony related to the identification of Hightower by Wilkins. Norman Hightower, Jacinto Hightower's step-father, testified that during 1984 and 1985, Jacinto Hightower was in the Army stationed at Fort Bliss, Texas. He said that Hightower did not return to New Jersey until a few days after April 1, 1985. Jacinto Hightower's wife, Michelle Hamilton, testified that Hightower did not return to New Jersey from Texas until a few days after April 6, 1985, which was the date of her daughter's first birthday. Shirley Baker, an employee at the Army Finance Center in Indianapolis, testified that Jacinto Hightower was not recorded as on leave until April 7 through April 11, 1985.
Defendant appeals setting forth the following arguments[1]:

POINT ITHE TRIAL COURT ERRED BY NOT DISMISSING THE INDICTMENT BASED ON THE FAILURE OF THE PROSECUTOR TO PROVIDE EXCULPATORY EVIDENCE TO THE GRAND JURY.

POINT IITHE INDICTMENT SHOULD BE DISMISSED AS THE STATE FAILED TO COMPLY WITH THE PROVISIONS OF THE INTERSTATE AGREEMENT ON DETAINER.

POINT IIITHE TRIAL COURT ERRED BY NOT ALLOWING THE DEFENDANT TO REPRESENT HIMSELF.

POINT IVTHE TRIAL COURT ERRED BY ADMITTING INTO EVIDENCE THE RESULTS OF THE IDENTIFICATION OF DEFENDANT.

POINT VTHE TRIAL COURT ERRED BY PERMITTING THE STATE TO ADDUCE REBUTTAL TESTIMONY AFTER IT HAD RESTED ITS CASE IN CHIEF AND THE REBUTTAL EVIDENCE COULD HAVE BEEN PRESENTED DURING THE CASE IN CHIEF.

POINT VITHE VERDICT IS AGAINST THE WEIGHT OF THE EVIDENCE AND THE DEFENDANT IS ENTITLED TO A NEW TRIAL.

POINT VIITHE CONDUCT OF THE PROSECUTOR, WHICH EXCEEDED THE BOUNDS OF PROPER ADVOCACY, DENIED THE DEFENDANT A FAIR TRIAL.

*99 POINT IXTHE SENTENCE IMPOSED WAS UNJUST, INAPPROPRIATE AND MANIFESTLY EXCESSIVE.

POINT XTHE ERRORS COMMITTED, IN THEIR ENTIRETY, DENIED DEFENDANT A FAIR TRIAL.
Defendant moved before trial to dismiss the indictment based on the failure of the prosecutor to provide exculpatory evidence to the grand jury. He argued that the State was under obligation to inform the grand jury of the identification of Hightower by Mark Irons and Margaret Langan. The trial judge denied the motion. We find no error.
A grand jury is an accusatory rather than an adjudicative body. United States v. Williams, 504 U.S. 36, 51, 112 S.Ct. 1735, 1744, 118 L.Ed.2d 352, 368 (1992); State v. Hogan, 144 N.J. 216, 235, 676 A.2d 533 (1996). For this reason there is judicial reluctance to interfere with the grand jury process. An indictment will be dismissed only if it is "manifestly deficient and palpably defective." State v. Wein, 80 N.J. 491, 501, 404 A.2d 302 (1979); Hogan, supra, 144 N.J. at 228, 676 A.2d 533. As we stated in State v. Scherzer, 301 N.J.Super. 363, 428, 694 A.2d 196 (App.Div.), certif. denied, 151 N.J. 466, 700 A.2d 878 (1997),
An indictment that appears sufficient on its face will not be dismissed as long as there is at least `some evidence' as to each element of the State's prima facie case. State v. Vasky, 218 N.J.Super. 487, 491, 528 A.2d 61 (App.Div.1987). As long as `some evidence' on each of the elements of the offenses is presented and there is nothing that detracted from the fairness of the grand jury proceeding, the indictment should stand.
[citing State v. Engel, 249 N.J.Super. 336, 360, 592 A.2d 572 (App.Div.), certif. denied, 130 N.J. 393, 614 A.2d 616 (1991).]
There is a limited duty on prosecutors to present evidence to the grand jury where such evidence refutes an element of the crime, directly negates guilt and is clearly exculpatory. Hogan, supra, 144 N.J. at 237, 676 A.2d 533; see also State v. Smith, 269 N.J.Super. 86, 91, 634 A.2d 576 (App.Div.), certif. denied, 137 N.J. 164, 644 A.2d 612 (1994). The sole issue before the grand jury is the determination of whether a prima facie case of guilt has been presented to the grand jury. The State is under no obligation to present testimony as to competing identifications of a perpetrator in a case such as the one at bar. Hogan, supra, 144 N.J. at 237-38, 676 A.2d 533. In this instance, we hold that the identifications by Irons and Langan of Hightower were not "clearly exculpatory" since they were contradicted by the testimony of three other witnesses who clearly identified defendant as the perpetrator of the murder and robbery. Their testimony before the grand jury was sufficient to establish a prima facie case against defendant. We find no abuse of discretion by the trial judge in light of the strength of the State's case presented to the grand jury and the nature of the exculpatory evidence. Finally, the finding of guilty beyond a reasonable doubt by the petit jury would render harmless any failure to present the alleged exculpatory evidence to the grand jury. United States v. Mechanik, 475 U.S. 66, 70, 106 S.Ct. 938, 941-42, 89 L.Ed.2d 50, 56 (1986); State v. Warmbrun, 277 N.J.Super. 51, 60, 648 A.2d 1153 (App.Div.), certif. denied, 140 N.J. 277, 658 A.2d 300 (1995).
Defendant next argues that it was error to deny his motions to dismiss the indictment for alleged failure of the State to comply with the provisions of the Interstate Agreement on Detainers Act (IAD), N.J.S.A. 2A:159A-1 to -15.
A Burlington County grand jury returned the indictment against defendant on July 29, 1987. He was then in the Philadelphia Detention Center charged with three murders.
*100 On August 5, 1987, the Burlington County Prosecutor's Office lodged a warrant as a detainer, which was forwarded to the Philadelphia Detention Center. On September 11, 1987, the Pennsylvania District Attorney's Office notified the Burlington County Prosecutor's Office that defendant had been formally arrested as a fugitive from New Jersey on August 13, 1987, and had refused to waive extradition. The State of New Jersey, Office of the Governor, forwarded paperwork to Pennsylvania for the extradition of defendant on October 7, 1987, and on April 7, 1988, the Burlington County Prosecutor's Office submitted the IAD Form V requesting temporary custody of defendant. At that time, defendant had been sentenced on one of three Pennsylvania murder charges and was incarcerated at Graterford State Prison pending disposition of the other charges. As a result, Pennsylvania authorities declined to offer temporary custody of defendant to New Jersey. Defendant also attempted to preclude his transfer to New Jersey by filing a writ in the Pennsylvania courts and appealing the denial up to the Pennsylvania Supreme Court.
Thereafter, on July 10, 1991, defendant filed a pro se motion in New Jersey Superior Court seeking dismissal of the Burlington County indictment, claiming that New Jersey had refused or failed to take custody of him within the time required under the IAD. In a letter dated July 25, 1991, the Criminal Division Manager of the Burlington County Superior Court replied by letter, advising defendant the Pennsylvania authorities had refused to approve New Jersey's request for temporary custody because of the pending charges.
On September 3, 1992, New Jersey filed another Form V request for temporary custody under the IAD, but Pennsylvania authorities again responded that defendant was unavailable because of open cases pending in Philadelphia County including his sentencing on a capital murder conviction. It was not until March 30, 1994, that defendant was sentenced in Pennsylvania on all the remaining charges.
On April 12, 1994, defendant sent via certified mail to the Burlington County Prosecutor's Office an IAD Form II notice requesting disposition of his New Jersey indictment. After the Pennsylvania District Attorney's Office wrote that they now had no objection to transferring defendant to New Jersey, defendant was transported on June 8, 1994. He alleges that New Jersey violated the requirements of the IAD and claims that he was prejudiced by the delay since two alibi witnesses died.
The IAD is an agreement among contracting states which sets out circumstances under which a party state may obtain temporary custody of a prisoner incarcerated in another jurisdiction. See generally State v. Millett, 272 N.J.Super. 68, 102, 639 A.2d 352 (App.Div.1994). The express purpose of the act is "to encourage the expeditious and orderly disposition of such charges and determination of the proper status of any and all detainers based on untried indictments, informations or complaints." N.J.S.A. 2A:159A-1. Accordingly, certain time restrictions are fixed. A defendant is required to be brought to trial within 180 days after he delivers to the prosecutor in the receiving state written notice of the place of his imprisonment and his request for a final disposition on the charges in the receiving state. N.J.S.A. 2A:159A-3(a). Moreover, upon request of the receiving state, the sending state must honor a jurisdiction's request for temporary custody, N.J.S.A. 2A:159A-4(a), within thirty days. The prisoner is then entitled to a trial within 120 days of arrival. N.J.S.A. 2A:159A-4(c). However, N.J.S.A. 2A:159A-6(a) provides for the tolling of these statutory time periods under the following circumstances:
In determining the duration and expiration dates of the time periods provided in Articles III and IV of this agreement, the running of said time periods shall be tolled whenever and for as long as the *101 prisoner is unable to stand trial, as determined by the court having jurisdiction of the matter.

[emphasis supplied.]
We affirm the denial of defendant's motion to dismiss. Outstanding charges pending in a sending state renders a defendant "unable to stand trial" in the receiving state under the IAD. State v. Miller, 299 N.J.Super. 387, 395, 397, 691 A.2d 377 (App.Div.), certif. denied, 151 N.J. 464, 700 A.2d 877 (1997); State v. Binn, 196 N.J.Super. 102, 481 A.2d 599 (Law Div.), aff'd as modified, 208 N.J.Super. 443, 506 A.2d 67 (App.Div.), certif. denied, 104 N.J. 471, 517 A.2d 452 (1986). There was no delay by the State in this case in seeking custody of defendant pursuant to the IAD. On the contrary, the record discloses that the State acted promptly and aggressively to have defendant transported to Burlington County to face the serious charges of the indictment including capital murder. See, e.g., State v. Chirra, 79 N.J.Super. 270, 278, 191 A.2d 308 (Law Div.1963). There is no indication of bad faith by the State or intentional delay in its response to defendant's request under the IAD for final disposition. See e.g., State v. Moreau, 287 N.J.Super. 179, 188, 670 A.2d 608 (Law Div.1995). Furthermore, defendant offered no proof in support of his claim of prejudice. In any event, since the alleged alibi witnesses supposedly died before March 30, 1994, the issue is moot because defendant was unable to stand trial in New Jersey before that date. N.J.S.A. 2A:159-6(a).
Prior to trial defendant requested that he be permitted to exercise his constitutional right to represent himself. See Faretta v. California, 422 U.S. 806, 819, 95 S.Ct. 2525, 2533, 45 L.Ed.2d 562, 572-73 (1975). Since such a decision results in the relinquishment of many of the benefits associated with representation by counsel, a defendant can exercise this right to self-representation only after first knowingly and intelligently waiving the right to counsel. Id. at 835, 95 S.Ct. at 2541, 45 L.Ed.2d at 581; State v. Crisafi, 128 N.J. 499, 509, 608 A.2d 317 (1992).
A pro se defendant's right to self-representation encompasses the right "to control the organization and content of his own defense, to make motions, to argue points of law, to participate in voir dire, to question witnesses, and to address the court and the jury at appropriate points in the trial." McKaskle v. Wiggins, 465 U.S. 168, 174, 104 S.Ct. 944, 949, 79 L.Ed.2d 122, 131 (1984). At the core of the defendant's "Faretta right" to conduct his own defense is the entitlement "to preserve actual control over the case he chooses to present to the jury." Id. at 178, 104 S.Ct. at 951, 79 L.Ed.2d at 133.
In the instant case the trial judge not only permitted defendant to represent himself but also allowed him to participate as "co-counsel" with his two assigned attorneys, a hybrid arrangement which enabled him to avoid the pitfalls of sole pro se representation yet gave him more than the minimum necessary Constitution protection. McKaskle v. Wiggins, supra, 465 U.S. at 182, 104 S.Ct. at 953, 79 L.Ed.2d at 122; see also State v. Roth, 289 N.J.Super. 152, 165, 673 A.2d 285 (App.Div.) (holding that a claim of right to hybrid representation may be foreclosed and is normally to be avoided), certif. denied, 146 N.J. 68, 679 A.2d 655 (1996); accord, State v. Long, 216 N.J.Super. 269, 275, 523 A.2d 672 (App. Div.1987); State v. McCleary, 149 N.J.Super. 77, 78-80, 373 A.2d 400 (App.Div.), certif. denied, 75 N.J. 26, 379 A.2d 257 (1977). Defendant was to elect whether he or one of his lawyers would question witnesses and make objections. The trial judge also permitted both defendant and one of his attorneys to make opening and closing statements.[2]
*102 Defendant argues that his self-representation was unduly and unjustifiably fettered by a ruling of the trial judge that he was not permitted to leave counsel table to approach a witness, walk around the courtroom or approach the bench for sidebar conferences. Instead he was given use of a wireless electronic listening system whereby he could sit at counsel table with one of his attorneys while the other went to sidebar. The trial judge's ruling was based on security concerns.
A trial judge is given wide discretion in determining proper security measures within the courtroom and is obliged to act to protect the jury, counsel, witnesses, and members of the public. This defendant was on trial for capital murder, had been convicted of murder in Pennsylvania and had received two life terms and a capital sentence. It is ludicrous to consider the minor restrictions imposed by the trial judge to be an abuse of discretion. To hold otherwise would prove that Dickens was right.
There was also no impropriety or error in the denial of defendant's mid-trial motion for a transfer from Southern State Prison in Trenton to the Burlington County Jail. There was no obligation to transfer him to a county jail with more limited security than a maximum security state prison. Placement of a prisoner in a particular institution is an administrative decision to be made by the Department of Corrections, State v. Clark, 54 N.J. 25, 26, 252 A.2d 720 (1969), and any appeal must be made to the Appellate Division. R. 2:2-3(a)(2); State v. Rydzewski, 112 N.J.Super. 517, 520, 271 A.2d 907 (App.Div.1970). Defendant took no such appeal.
Defendant's main argument is that it was error for the trial judge to admit the testimony of Brodsky and Irons as to their identifications of him. A Wade[3] hearing was conducted on the identifications based on a photographic array. Sergeant Scott Fitz-Patrick of the homicide unit of the Burlington County Prosecutor's Office showed the array to all three victims on June 29, 1988. The array consisted of eight photographs with defendant's photograph as number five. Fitz-Patrick testified that the other seven photographs were similar to defendant with respect to race, age, facial hair, skin color and hair style.
Fitz-Patrick first showed the array to Cloran, who said he could not make an identification. When the array was shown to Brodsky, it took less than a minute for him to identify defendant as the person who committed the robbery and murder. Fitz-Patrick then showed the array to Irons, who told him that photographs five and seven were similar to the person who had committed the crimes, but he could not be certain. Irons testified that he was less than a foot away from the assailant when he answered his questions about the job application. He was unsure as to whether photographs five and seven depicted the assailant. On the other hand, Brodsky testified that he was about two feet away from the assailant, and he identified the photograph of defendant.
Defendant argues that the age range of the persons depicted in the photographs was too wide and the array thereby impermissibly suggestive. The trial judge ruled the identification testimony admissible, finding that defendant had not shown by a preponderance of the evidence that there was any impermissible suggestiveness and that under the totality of the circumstance there was no substantial likelihood of irreparable misidentification. The judge remarked that his review of the photographic array satisfied him that the photographs were sufficiently similar so as to not be suggestive of an identification. He specifically stated that the age range of the participants in the array was not readily apparent from viewing the pictures.
The issue of admissibility into evidence of eyewitness identifications has *103 evolved into a two-prong test. State v. Madison, 109 N.J. 223, 232, 536 A.2d 254 (1988); see also Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). The hearing judge must first decide whether the procedure utilized by the State was in fact impermissibly suggestive, and the defendant bears the burden by a preponderance of the evidence to establish that the identification procedure was suggestive so as to result in a substantial likelihood of misidentification. State v. Hurd, 86 N.J. 525, 548, 432 A.2d 86 (1981); State v. Santoro, 229 N.J.Super. 501, 504, 552 A.2d 184 (App.Div.1988). If the defendant meets that burden, the court must then decide whether the procedure resulted in a "very substantial likelihood of irreparable misidentification." State v. Madison, supra, 109 N.J. at 232, 536 A.2d 254 (quoting Simmons v. United States, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247, 1253 (1968)). If the court finds the identification to be reliable despite the impermissibly suggestive nature of the procedure, the identification may still be admitted into evidence. Id. at 232-33, 536 A.2d 254. Credibility of the identification is not the issue on the question of admissibility but rather is a matter of weight for the jury. State v. Farrow, 61 N.J. 434, 451, 294 A.2d 873 (1972), cert. denied, 410 U.S. 937, 93 S.Ct. 1396, 35 L.Ed.2d 602 (1973).
Defendant argues that the age range of the individuals in the photographs between nineteen and thirty-seven was too great for a "fair and reasonable choice to be made." There is no basis in law or fact for this contention. An age variance among people depicted in photographs is not unduly suggestive in itself. See, e.g., People v. Guest, 166 Ill.2d 381, 211 Ill.Dec. 490, 655 N.E.2d 873, 881 (1995), cert. denied, 516 U.S. 1176, 116 S.Ct. 1272, 134 L.Ed.2d 218 (1996); State v. Bennett, 633 So. 2d 272, 274 (La.App.1993); People v. Smoot, 166 Misc.2d 862, 868, 634 N.Y.S.2d 367, 371 (N.Y.Sup.Ct.1995). The hearing judge specifically found that any age disparity was not readily apparent and that no one photograph stood out. These findings were based on credible evidence in the record and will not be disturbed. State v. Locurto, 157 N.J. 463, 472, 724 A.2d 234 (1999); State v. Johnson, 42 N.J. 146, 161, 199 A.2d 809 (1964); State v. Mance, 300 N.J.Super. 37, 58, 691 A.2d 1369 (App.Div. 1997).
Defendant also argues that the court erroneously permitted the State to introduce improper rebuttal testimony. The defense of misidentification was based in large part on the testimony of Margaret Langan positively identifying Hightower as the man she saw fleeing from the scene of the crimes. While Langan was the only witness to positively identify Hightower as the assailant, Irons had initially identified Hightower's picture in 1985 with eighty percent certainty and then ninety-five percent certainty after seeing him later in court. Fioretti also selected Hightower out of the 1985 photographic array although he said he was not certain. He later selected defendant's picture from an array shown to him in 1988 and positively identified the defendant in court.
After the defense rested, the prosecutor called his three rebuttal witnesses to prove that Hightower was in the United States Army and in Texas on the date of the crime. The testimony was permitted despite the argument that it was improper rebuttal and was permissible only during the State's case in chief.
In a criminal prosecution the preferable course to be followed is for the State to present everything relevant as part of its case in chief. State v. DeRocco, 53 N.J.Super. 316, 325, 147 A.2d 280 (App.Div.1959). Rebuttal evidence is permissible when necessary because of new subjects introduced on direct or cross-examination of defense witnesses. State v. Provoid, 110 N.J.Super. 547, 557, 266 A.2d 307 (App.Div.1970). Where the evidence would have been admissible in the State's case in chief the trial judge is vested with broad discretion that will not *104 be disturbed absent a gross abuse. State v. Sturdivant, 31 N.J. 165, 178, 155 A.2d 771 (1959), cert. denied, 362 U.S. 956, 80 S.Ct. 873, 4 L.Ed.2d 873 (1960); State v. Balles, 47 N.J. 331, 343, 221 A.2d 1 (1966), appeal dismissed and cert. denied, 388 U.S. 461, 87 S.Ct. 2120, 18 L.Ed.2d 1321 (1967).
The testimony of Hightower's father, his wife and the Army custodian placing him in Texas at the time of commission of the crime was proper rebuttal to Langan's testimony, which was the only direct proof by the defense that Hightower was the perpetrator. There was no abuse of discretion let alone a gross abuse, by the trial judge in permitting the testimony.
Defendant's argument that the trial judge erred in denying his new trial on the ground that the verdict was against the weight of the evidence is without merit and does not warrant discussion in a written opinion. R. 2:11-3(e)(2). The evidence of defendant's guilt was overwhelming and damning. There was no miscarriage of justice. R. 2:10-1; State v. Johnson, 203 N.J.Super. 127, 134, 495 A.2d 1367 (App. Div.), certif. denied, 102 N.J. 312, 508 A.2d 195 (1985).
There is also no merit in defendant's contention that the conduct of the prosecutor denied him a fair trial. Prosecutorial misconduct must substantially prejudice the defendant's right to have an impartial jury evaluate the merits of the case. State v. Bucanis, 26 N.J. 45, 56, 138 A.2d 739, cert. denied, 357 U.S. 910, 78 S.Ct. 1157, 2 L.Ed.2d 1160 (1958). To justify a reversal of a conviction the impact of the prosecutorial misconduct must be palpable. State v. Roach, 146 N.J. 208, 219, 680 A.2d 634, cert. denied, 519 U.S. 1021, 117 S.Ct. 540, 136 L.Ed.2d 424 (1996). None of the instances defendant claims to constitute prosecutorial misconduct were "so egregious as to deprive defendant of a fair trial." State v. Ramseur, 106 N.J. 123, 322, 524 A.2d 188 (1987), cert. denied, 508 U.S. 947, 113 S.Ct. 2433, 124 L.Ed.2d 653 (1993). Indeed we find no prosecutorial misconduct in this case.
Finally, defendant submits that the claimed errors by the trial judge in their aggregate resulted in an unfair trial. State v. Orecchio, 16 N.J. 125, 129, 106 A.2d 541 (1954). However, the record shows that defendant received a fair trial. A defendant is entitled to a fair trial, not a perfect one. State v. Marshall, 123 N.J. 1, 586 A.2d 85 (1991), cert. denied, 507 U.S. 929, 113 S.Ct. 1306, 122 L.Ed.2d 694 (1993) (quoting Lutwak v. United States, 344 U.S. 604, 619, 73 S.Ct. 481, 490, 97 L.Ed. 593, 605 (1953)); State v. Boiardo, 111 N.J.Super. 219, 233, 268 A.2d 55 (App.Div.), certif. denied, 57 N.J. 130, 270 A.2d 33 (1970), cert. denied, 401 U.S. 948, 91 S.Ct. 931, 28 L.Ed.2d 231 (1971).
We deal next with defendant's sentence. He received the mandatory custodial term of life imprisonment with thirty years parole ineligibility on his conviction for murder to run consecutively to any other sentences including those imposed in Pennsylvania. On each of the two counts of first degree robbery, the sentencing judge imposed an extended term of life imprisonment with a twenty-five year parole ineligibility period, to run consecutively to the sentence imposed on the murder charge and to any other sentences for unrelated crimes. The aggregate sentence was two life sentences with a fifty-five year parole ineligibility period.
Appellate review of a sentence focuses upon the question of whether the findings of fact regarding aggravating and mitigating factors were based on competent and reasonably credible evidence in the record, whether the court correctly applied the sentencing guidelines set forth in the Code, and whether the application of the facts to the law constituted such a clear error of judgment as to shock the judicial conscience. State v. Roth, 95 N.J. 334, 363-65, 471 A.2d 370 (1984). Under this standard reviewing courts must avoid substituting their judgment for the judgment *105 of the trial court. Id. at 365, 471 A.2d 370.
We first address the imposition of an extended term upon defendant as a persistent offender. Under State v. Dunbar, 108 N.J. 80, 89, 527 A.2d 1346 (1987), the trial judge must engage in a multi-step analysis when imposing an extended sentence:
First, the sentencing court must determine whether the minimum statutory predicates for subjecting the defendant to an extended term have been met. Second, the court must determine whether to impose an extended sentence. Third, it must weigh the aggravating and mitigating circumstances to determine the base term of the extended sentence. Finally, it must determine whether to impose a period of parole ineligibility.
The sentencing judge determined that the statutory requirements of N.J.S.A. 2C:44-3(a) for the imposition of an extended term on defendant as a persistent offender were met by a showing beyond a reasonable doubt: (1) defendant had been convicted of three murder convictions, for which he received a death sentence and two life sentences; (2) he also had other prior convictions; (3) aggravating factors presented included the risk of another offense, the extent of defendant's record, and the need to deter others from violating the law; (4) there were no mitigating factors; and (5) defendant was of the requisite age when the present offenses were committed.
Defendant asserts that the sentencing judge misinterpreted Dunbar by not properly focusing upon the crimes in issue rather than other offenses in the defendant's criminal history. We disagree. Our review of the record satisfies us that the sentencing judge focused primarily on the offense in issue since that conduct occasioned the sentence. Dunbar, supra, 108 N.J. at 91-92, 527 A.2d 1346. The judge also properly considered defendant's criminal record in deciding whether the protection of the public mandates the imposition of an extended term. Ibid.
Defendant also alleges that it was error to consider his other convictions committed after the present offenses and pending appeal in Pennsylvania. However, under N.J.S.A. 2C:44-3(a), multiple convictions may be considered by the sentencing court in determining if a defendant is a persistent offender irrespective of their chronology so long as the other statutory criteria are met. State v. Mangrella, 214 N.J.Super. 437, 445-46, 519 A.2d 926 (App.Div.1986), certif. denied, 107 N.J. 127, 526 A.2d 194 (1987). Common sense and logical analysis indicates that defendant's criminal history of committing violent crimes may be considered as evidence of a predisposition to commit the same or similar crimes unless confined in prison. State v. Pennington, 154 N.J. 344, 355, 712 A.2d 1133 (1998). When a sentencing judge considers the issue of whether a defendant is a persistent offender under N.J.S.A. 2C:44-4(a), the judge may weigh judgments of conviction entered chronologically after the defendant committed the instant crime.
Mangrella stated that the trial court could consider any judgment of conviction entered prior to sentencing but restricted consideration to those judgments not pending direct appeal or subject to a right of direct appeal. Id. at 445-46, 519 A.2d 926. However, in State v. Haliski, 140 N.J. 1, 656 A.2d 1246 (1995), the Supreme Court addressed the question of whether a conviction was to be considered "prior" for purposes of enhanced sentencing under the Graves Act when the time for appeal of that conviction had not expired. Rejecting that part of Mangrella dealing with the issue, the Haliski Court held that a criminal defendant cannot escape the statutory higher penalty simply because a prior conviction is pending on appeal. Id. at 17, 656 A.2d 1246. The sentencing court must impose a provisional Graves Act mandatory term sentence under such circumstances. *106 Id. at 18, 656 A.2d 1246. If the prior conviction is subsequently reversed on appeal, the mandatory term must then be vacated. Id. at 20, 656 A.2d 1246.
We hold that the rationale of Haliski is applicable to discretionary extended term sentences as well as the mandatory extended terms of the Graves Act. Therefore, when a defendant is a persistent offender under N.J.S.A. 2C:44-3(a), a sentencing judge may consider convictions entered after the defendant committed the instant crime even when there is an appeal pending or right of direct appeal. Accordingly, in the instant case the sentencing judge properly considered defendant's other convictions in ruling on the State's application for an extended term. Should defendant be successful in his appeals of those other convictions, the extended term sentence must be amended since the adequate predicate convictions for enhanced sentencing no longer exist. Haliski, supra, 140 N.J. at 20, 656 A.2d 1246.
Defendant's remaining contentions regarding his sentencing have no merit. He argues that the sentencing judge failed to explain why there was a special need to deter this particular defendant as required by State v. Martelli, 201 N.J.Super. 378, 385, 493 A.2d 70 (App.Div. 1985). The sentencing judge duly noted that defendant murdered four people on four separate occasions and concluded that he should be separated from society for as long as is legally possible to reduce the number of potential victims.
Defendant also argues that the judge erred in "double counting" as an aggravating factor "[t]he gravity and seriousness of harm inflicted on the victim," N.J.S.A. 2C:44-1(a)(2), when that factor is an element of the offense of murder. See State v. Jarbath, 114 N.J. 394, 404, 555 A.2d 559 (1989). However, the sentencing judge did not list the seriousness and gravity of harm as an aggravating factor. While he noted that the family of the murder victim would never get over the incident and that defendant presented as an immoral sociopath, the judge was summarizing the consequence of defendant's conduct as opposed to counting "harm to the victim" as an aggravating factor.
Defendant's argument that all of the offenses should have merged into the murder convictions overlooks the fact that proof of the armed robbery offenses was not necessary to convict him of murder. State v. Brown, 138 N.J. 481, 651 A.2d 19 (1994), overruled on other grounds by State v. Cooper, 151 N.J. 326, 700 A.2d 306 (1997). Therefore, the sentencing judge properly declined to merge the robbery conviction into the murder conviction.
Nonetheless, we are constrained to remand the matter for resentencing. As conceded by the State, the sentencing judge erred in imposing extended terms for both first degree robbery convictions since N.J.S.A. 2C:44-5(a)(2) precludes multiple extended terms. Pennington, supra, 154 N.J. at 361, 712 A.2d 1133. Moreover, a remand is also necessary for the sentencing judge to give a separate statement of reasons for the imposition of consecutive terms to enable us to determine whether the imposition of consecutive sentences was a proper exercise of discretion. State v. Miller, 108 N.J. 112, 122, 527 A.2d 1362 (1987); State v. Yarbough, 100 N.J. 627, 498 A.2d 1239 (1985), cert. denied, 475 U.S. 1014, 106 S.Ct. 1193, 89 L.Ed.2d 308 (1986).
We affirm defendant's convictions and remand for the purpose of resentencing in accordance with this opinion.
NOTES
[1] Defendant's brief omits Point Eight.
[2] We specifically do not pass upon the advisability of this or any other aspect of the hybrid representation afforded to defendant other than to hold that defendant cannot claim prejudice or attack it upon constitutional grounds.
[3] United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967).