866 A.2d 229

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v. MICHAEL
JANOWSKI, DEFENDANT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Submitted January 20, 2005—Decided February 8, 2005.

Before Judges CONLEY, BRAITHWAITE and WINKELSTEIN.

*Joseph L. Bocchini, Jr.*, Mercer County Prosecutor, attorney for appellant (*Matthew Regulski*, Assistant Prosecutor, of counsel and on the brief).

*Lewis, Wood & Brown*, attorneys for respondent (*Thomas E. Brown*, on the brief).

The opinion of the court was delivered by

BRAITHWAITE, J.A.D.

The State appeals, by leave granted, from an order suppressing the out-of-court photographic identification of defendant Michael Janowski because the set of computerized photographs from which defendant was identified by the victim was not preserved and recorded. The State contends that the motion judge erroneously interpreted existing law and that the automatic exclusion of the out-of-court identification is inappropriate. We agree with the State and now reverse.

Defendant was arrested and subsequently indicted for: (1) first-degree robbery, *N.J.S.A.* 2C:15–1; (2) third-degree theft by unlawful taking, *N.J.S.A.* 2C:20–3a(3); (3) third-degree possession of a weapon for an unlawful purpose, *N.J.S.A.* 2C:39–4d; and (4) fourth-degree unlawful possession of a weapon, *N.J.S.A.* 2C:39–5d.

Defendant challenged the out-of-court identification. A *Wade*[1] hearing was conducted. The following proofs were presented at the hearing. On February 7, 2003, between 9 and 11 a.m., Reedel Wilson ("the victim") was approached by a man, later identified as defendant, on the street in Trenton. Despite snowy conditions, the victim could still see clearly even though she had once suffered a gun shot wound to her cheek and was not wearing the glasses she normally wears only for reading and watching television. The man was white with brown hair and a "crater[ed]" or "pock mark[ed]" face wearing "black or blue jeans, black jacket with red sleeves and boots...." He carried "a garden shovel on his shoulder...." The man demanded the victim's purse and pushed her to the ground even though she complied with the man's demand.

The victim met with Detective Manuel Montez at the Trenton Police headquarters. Detective Montez had the victim view photographs on a computer in an effort to identify her attacker. Detective Montez testified that the computer contained photographs of individuals previously arrested by the police depart-

---

[1] *United States v. Wade*, 388 *U.S.* 218, 87 *S.Ct.* 1926, 18 *L.Ed.*2d 1149 (1967).

ment. He further testified that, using a program called "picture link," he directed the system to display only photographs of individuals who were white, male and within the age range the victim provided in her description of the attacker.

Detective Montez explained during his testimony that it is possible to cull photographs from the system based on a total of seven characteristics including gender, race, height, weight, eye color, hair color and age range. However, Detective Montez testified that he used only race, gender and age, so the number of photographs displayed would be greater.

Once the desired characteristics were entered into the system, the computer began to display "12 photographs at a time for between 10 and 12 seconds." After viewing between thirty-six to sixty photographs, the victim identified one of the images as that of the man who had attacked her on the street earlier that day. Detective Montez printed an enlarged version of the photograph, and then had the victim view and sign it as well. None of the other photographs viewed by the victim were printed or maintained as part of the investigative record.

Detective Montez further testified that after the victim identified defendant's photograph, he was able to use the picture link system to obtain defendant's name. Additionally, Detective Montez testified that prior to the victim's identification he had no "idea who the suspect was by name or otherwise." He further testified that he did not indicate to the victim whether her attacker would indeed appear in the photographs she was about to view. The victim also testified, and her testimony "was substantially the same as [Detective] Montez regarding the identification procedure."

Following the hearing, the motion judge ruled that the photographs viewed by the victim constituted an array. He further held that the State's failure to retain all of the photos viewed by the victim prevented a "meaningful inquiry into the specific procedure employed by the State." The judge therefore suppressed the out-of-court identification. The judge went on to rule, however,

that the victim's in-court identification of defendant would be admissible because it was "based on her view of him at the time of the commission of the crime, and not as a result of the photographic array employed by the State."

The State argues that the motion judge erred when he construed the display of photographs viewed by the victim as an array subject to *State v. Peterkin,* 226 *N.J.Super.* 25, 543 *A.*2d 466 (App.Div.), *certif. denied,* 114 *N.J.* 295, 554 *A.*2d 850 (1988). The State contends that what the victim actually viewed was, instead, an "average 'mug shot book' identification[ ] used everyday by police departments across the State, whether ... physical or computer generated" and, therefore need not be preserved to be admissible. We agree.

"[E]nforcement authorities should ... make a complete record of an identification procedure if it is feasible to do so, to the end that the event may be reconstructed in the testimony." *State v. Earle,* 60 *N.J.* 550, 552, 292 *A.*2d 2 (1972). Generally, where a photographic identification is employed, the photographs shown to a witness should be recorded. *Ibid.*

While photographic arrays must be preserved to be admissible, the use of mug shot books to develop an as-yet-to-be-determined suspect does not require that all the photographs viewed in the mug shot books be preserved. *State v. Ruffin,* 371 *N.J.Super.* 371, 395, 853 *A.*2d 311 (App.Div.2004).

Mug shot books: (1) contain large numbers of randomly selected photographs; (2) are kept for the purpose of investigation, not confirmation; and (3) are a resource "shown to witnesses as a matter of course to see if a suspect [can] be found." *Ibid.* Here, the picture link system was, in effect, a mug shot book. Detective Montez testified that the computer held the photographs of all individuals arrested by the Trenton Police. Instead of going to a shelf and removing only the books containing mug shot photographs of white males in the age range provided by the victim, Detective Montez went to the computer and retrieved only

the mug shot photographs of those with the same characteristics. We are satisfied that each computerized display containing the twelve photographs was the equivalent of a page of a mug shot book.

A photographic array, on the other hand, is a different investigative device. Photographic arrays typically contain a small number of photographs. *See State v. Ways,* 180 *N.J.* 171, 175, 850 *A.2d* 440 (2004) (array contained eight photographs); *State v. Robinson,* 165 *N.J.* 32, 36, 754 *A.2d* 1153 (2000) (five photographs in photographic lineup); *State v. Cook,* 330 *N.J.Super.* 395, 416, 750 *A.2d* 91 (App.Div.) (array contained eight photographs), *certif. denied,* 165 *N.J.* 486, 758 *A.2d* 646 (2000); *State v. Burton,* 309 *N.J.Super.* 280, 286, 706 *A.2d* 1181 (App.Div.) (array contained six photographs), *certif. denied,* 156 *N.J.* 407, 719 *A.2d* 639 (1998); *State v. Rodriquez,* 264 *N.J.Super.* 261, 268, 624 *A.2d* 605 (App. Div.1993) (array contained six photographs), *aff'd,* 135 *N.J.* 3, 637 *A.2d* 914 (1994); *State v. Robinson,* 253 *N.J.Super.* 346, 355, 601 *A.2d* 1162 (App.Div.) (eight photographs in lineup), *certif. denied,* 130 *N.J.* 6, 611 *A.2d* 646 (1992); *State v. Reyes,* 237 *N.J.Super.* 250, 567 *A.2d* 287 (App.Div.1989) (array contained seven photographs); *State v. Taplin,* 230 *N.J.Super.* 95, 552 *A.2d* 1015 (App. Div.1988) (eight photographs in an array). *But see State v. Gunter,* 231 *N.J.Super.* 34, 554 *A.2d* 1356 (App.Div.) (three separate arrays containing thirty-five to forty, fifteen and six photographs respectively), *certif. denied,* 117 *N.J.* 80, 563 *A.2d* 841 (1989); *State v. Cherry,* 289 *N.J.Super.* 503, 513, 674 *A.2d* 589 (App.Div.1995) (array contained forty-two photographs).

Furthermore, police use photographic arrays to confirm or eliminate suspects. *See* (Letter from Attorney General John J. Farmer, Jr. to All County Prosecutors et al of 4/18/2001, at 1.) (accompanying Attorney General Guidelines for Preparing and Conducting Photo and Live Lineup Identification Procedures). The police typically have someone in mind when they prepare a photographic array to be shown to a witness. *See State v. Clausell,* 121 *N.J.* 298, 309, 580 *A.2d* 221 (1990) (defendant's

photograph included in array); *State v. Tilghman,* 345 *N.J.Super.* 571, 573, 786 *A.*2d 128 (App.Div.2001) (noting suspect, who was known to police, was placed in photographic array based on witness's pre-identification description to confirm whether he was the perpetrator); *State v. Pierce,* 330 *N.J.Super.* 479, 484, 750 *A.*2d 139 (App.Div.2000) (array contained photograph of suspect); *Cook, supra,* 330 *N.J.Super.* at 416, 750 *A.*2d 91 (array contained defendant's photograph); *State v. Onysko,* 226 *N.J.Super.* 599, 601, 545 *A.*2d 226 (App.Div.1988) (array contained defendant's photograph). Moreover, police construct photographic arrays and personally present them to witnesses, unlike a mug shot book, which is already assembled for a witness's perusal.

Detective Montez testified that he had no idea who the suspect might be prior to showing the victim the picture link system. He also testified that given the situation, the procedure utilized to conduct such an investigation included using the picture link system in the manner he described. In prior use, Detective Montez testified that the system could display "anywhere from 100 to over a thousand [photographs]."

Like the identification deemed admissible in *Ruffin, supra,* which was made with the use of a mug shot book, the victim here was given a collection of photographs containing a potentially large, albeit unknown, number of individuals "in the hope of finding a suspect." 371 *N.J.Super.* at 395, 853 *A.*2d 311. It was only happenstance that she saw defendant after viewing only three to five "pages" or screens. Also, like in *Ruffin, supra,* defendant became a suspect only after the victim identified him. *Ibid.*

The motion judge made no finding that either Detective Montez or the victim's testimony lacked credibility. In fact, he relied on Detective Montez's testimony to describe, in his decision, how the picture link system works.

Given that the computer system here contained large numbers of randomly selected photographs, kept for the purpose of investigation, not confirmation, and is a resource "shown to witnesses as a matter of course to see if a suspect [can] be found," we conclude

that it is essentially a mug shot book and the failure to retain all of the photos seen by the victim is not fatal to the admission of the out-of-court identification. *Ibid.*

We also agree with the State that even if the collection of photographs viewed by the victim was construed as an array, which should have been retained, the failure to retain those photographs does not automatically result in suppression of the out-of-court identification.

Our Supreme Court has held that while photographs used in identification procedures should be recorded or retained, a failure to do so will not necessarily invalidate the identification. *Earle, supra,* 60 *N.J.* at 552, 292 *A.*2d 2. Instead, such an omission, if not explained, should be weighed in deciding upon the probative value of the identification. *Ibid.* The question is whether the procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. *Ibid.*

■ "The issue of admissibility into evidence of eyewitness identifications has evolved into a two-prong test." *Cook, supra,* 330 *N.J.Super.* at 417, 750 *A.*2d 91 (citing *State v. Madison,* 109 *N.J.* 223, 232, 536 *A.*2d 254 (1988)). First, the defendant must prove by a preponderance of the evidence "that the identification procedure was suggestive so as to result in a substantial likelihood of misidentification." *Ibid.* (citing *State v. Hurd,* 86 *N.J.* 525, 548, 432 *A.*2d 86 (1981); *State v. Santoro,* 229 *N.J.Super.* 501, 504, 552 *A.*2d 184 (App.Div.1988)). Second, "[i]f the defendant meets that burden, the court must decide whether the procedure resulted in a 'very substantial likelihood of irreparable misidentification.'" *Ibid.* (quoting *Madison, supra,* 109 *N.J.* at 232, 536 *A.*2d 254).

■ Here, defendant produced no evidence that the procedure Detective Montez employed was impermissibly suggestive. In fact, Detective Montez testified that he did not indicate to the victim that defendant's image would even appear in the collection of photographs she was about to view. The victim testified that Detective Montez told her to simply view the photographs to "see

if the guy was there." Also Detective Montez did not identify any of the people whose photograph appeared. Additionally, Detective Montez testified that, other than initially inputting the sex, race and age range provided by the victim, he had no control over how the system displayed the photographs. Moreover, Detective Montez testified that the photographs displayed by the picture link system bore no information about the person pictured.

Nothing in the testimony given by Detective Montez or the victim indicates that the procedure was suggestive. Because nothing Detective Montez did or said to the victim, nor anything about the manner in which the picture link system displayed the images could be construed as an attempt to influence the victim to · choose defendant's photograph, there is nothing to suggest that the identification procedure "was anything other than a neutral presentation." *Ruffin, supra,* 371 *N.J.Super.* at 395, 853 *A.2d* 311.

Even if the procedure employed by Detective Montez was impermissibly suggestive, the identification may reasonably be said to have not resulted in a very substantial likelihood of irreparable misidentification. Even if an identification procedure is deemed impermissibly suggestive, it may still be admissible where the identification "possesses certain features of reliability." *Manson v. Brathwaite,* 432 *U.S.* 98, 110, 97 *S.Ct.* 2243, 2251, 53 *L.Ed.2d* 140, 151 (1977). Accordingly, whether an identification may be considered reliable depends on: (1) the witness's opportunity to view the suspect; (2) the degree of attention the witness gave to the suspect; (3) the accuracy of the description the witness gave before the identification; (4) the witness's certainty of the identification; and (5) the amount of time between the crime and subsequent identification. *Id.* at 114, 97 *S.Ct.* at 2253, 53 *L.Ed.2d* at 154. Unless the sum of these factors is outweighed by the "corrupting effect of the suggestive identification," the identification is reliable and may be admitted. *Ibid.*

In *Brathwaite, supra,* the showing of a single photograph of a suspect to the witness was conceded to be suggestive. *Id.* at 109, 97 *S.Ct.* at 2250, 53 *L.Ed.2d* at 151. However, the identification

was deemed reliable because: (1) the witness had two to three minutes to observe the suspect; (2) the witness's attention given to the suspect was not casual or passing; (3) the initial description included the suspect's race, height, build, hair style and color, and a predominant facial feature; (4) the witness was certain as to the identification; and (5) the identification took place just two days after the witness's initial observation of the suspect. *Id.* at 114–16, 97 *S.Ct.* at 2254–55, 53 *L.Ed.*2d at 154–55.

Here, the motion judge found that "[t]here was nothing in [the victim's] testimony or her demeanor which evidenced anything but truthfulness." The victim testified that although she observed defendant's face for about five or six seconds, she was able to get a good enough look at his face to notice it was pock marked. The judge found that the victim gave adequate attention to defendant during the robbery.

The victim further testified that when she saw defendant's photograph on the computer screen she "jumped and ... said that's him...." Moreover, the victim testified that she was positive that the photograph she signed and dated was that of the person who robbed her. Finally, the victim's identification of defendant, through the use of the picture link system, occurred, at best, some five hours after the robbery.

Here, because the victim had ample opportunity to view and gave sufficient attention to the defendant during the robbery, provided an accurate description of defendant following the incident and was certain of the identification made within just a few hours after the crime, her ability to make an accurate identification is "hardly outweighed by the corrupting effect" of any suggestiveness the procedure might have had. *Id.* at 116, 97 *S.Ct.* at 2254, 53 *L.Ed.*2d at 155. At its essence, the issue here is not the admissibility of testimony relating to the out-of-court identification, but rather the credibility to be afforded it, which is a "matter of weight for the jury." *Cook, supra,* 330 *N.J.Super.* at 417, 750 *A.*2d 91 (citing *State v. Farrow,* 61 *N.J.* 434, 451, 294 *A.*2d 873

(1972), *cert. denied,* 410 *U.S.* 937, 93 *S.Ct.* 1396, 35 *L.Ed.*2d 602 (1973)).

We reverse and remand for further proceedings.